## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIBCO INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| VIEGA LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, NIBCO INC. ("NIBCO" or "Plaintiff"), by its attorneys, brings this action for damages and injunctive relief against Defendant, VIEGA LLC ("Viega" or "Defendant"). NIBCO alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is an antitrust action directed at Viega's anticompetitive conduct in the markets for copper press fittings and carbon steel press fittings.

2.    Fittings are essential components of pipeline systems that are used to join pipes or tubes. Fittings can join pipes in straight lines or change, divide, or otherwise direct the flow of media, including potable water, process water, oil, gases, and fuel. Fittings are produced in geometrical configurations of varying sizes and surface coating.

3.     Pipeline systems, including fittings, can be made from different raw materials, such as copper, bronze, carbon steel, stainless steel, and thermoplastics. The plumbing industry differentiates between these pipeline systems because each one has optimal benefits suited to different applications. Black iron pipe is used, for example, to transport fuel oil and natural gas, but is never used to transport medical oxygen.

4.     Press technology refers to the use of hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and pipe. Press technology provides a faster, safer, and more reliable method of joining fittings and pipe without compromising the quality of installation.

5.     Viega is a privately-owned company that manufactures, imports, and sells fittings in the United States.

6.     Viega possesses (and for several years has possessed) monopoly power in the market for carbon steel press fittings, which are press fittings used for black iron pipe. Viega's carbon steel press fittings were the first to market and, until July 2017, the only carbon steel press fittings approved in the United States. Viega controls at least 95% of the carbon steel press fittings market.

7.     Viega also holds a well-established, dominant position in the market for copper press fittings, which are press fittings used for copper pipe. It controls approximately 71% of the U.S. market.

8.    NIBCO is a family and employee owned business with over 100 years of experience in manufacturing and selling fittings.  It offers one of the most robust lines of copper press fittings in the United States and is Viega's most significant competitor in the copper press fittings market.  On average, NIBCO's prices for copper press fittings are lower than Viega's prices for copper press fittings – sometimes as much as 15% lower.  NIBCO does not manufacture carbon steel press fittings.

9.    Fittings manufacturers such as NIBCO and Viega sell fittings almost entirely through wholesale distributors.  The wholesale distributors in turn sell fittings to contractors, developers, and other end users.

10.    To enhance or at least maintain its dominant position in the copper press fittings market, Viega has engaged in systematic anticompetitive conduct to undermine NIBCO's attempts to maintain and expand its customer base.

11.    Viega has used its market power in the carbon steel press fittings market to coerce wholesale distributors not to buy copper press fittings from NIBCO. Specifically, Viega refuses to sell its carbon steel press fittings unless a wholesale distributor also purchases Viega's copper press fittings and does not purchase copper press fittings from NIBCO.

12.    Viega also coerces wholesale distributors not to purchase copper press fittings from NIBCO by withholding discounts, rebates, and other pricing

3

concessions for its carbon steel press fittings. This pricing penalty renders the combination of Viega's copper press fittings and carbon steel press fittings the only viable economic option.

13.    Viega's conduct has denied competitors such as NIBCO free access to the market for copper press fittings, not because Viega has a better product or a lower price, but because of its power in the market for carbon steel press fittings. At the same time, wholesale distributors and end users are forced to forego their free choice and pay higher prices.

14.    Viega's anticompetitive conduct has been, and continues to be, effective in maintaining and stabilizing prices at artificially inflated supra-competitive levels, eliminating and excluding potential competition, extending or maintaining its market power, and fortifying barriers to entry in the copper press fittings market.

15.    NIBCO is the direct target of Viega's anticompetitive conduct. As a result of Viega's conduct, NIBCO has lost existing and potential wholesale distributors for its copper press fittings. Absent Viega's anticompetitive conduct, NIBCO's revenues would be substantially greater and its competitive influence would have a downward effect on pricing in the copper press fittings market.

16.    Viega's anticompetitive conduct has also injured consumers. Wholesale distributors are injured because they are: (a) forced to pay higher prices

4

for copper press fittings caused by decreased competition between fittings manufacturers; (b) deprived of the freedom to make competitive choices about which copper press fittings should be stocked and used; and (c) deprived of the benefit of continuous innovation. End users are similarly injured because they also pay higher prices, and because they are deprived of freedom of choice.

17.    Unless stopped, Viega will continue to misuse its monopoly power to artificially exclude competition, maintain artificially inflated prices, and deprive consumers of free choice.

18.    As a result, NIBCO brings this action against Viega to recover damages, and to obtain injunctive and other equitable relief for violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), Section 3 of the Clayton Act (15 U.S.C. § 14), and state common law.

## II.    THE PARTIES

19.    Plaintiff NIBCO is in the business of developing and manufacturing fittings, valves and flow control solutions for residential, commercial, industrial, and institutional construction. NIBCO is incorporated under the laws of the State of Indiana with its headquarters located at 1516 Middlebury Street, Elkhart, Indiana 46515.

20.    Defendant Viega manufactures and distributes plumbing, heating, and pipe joining systems for industrial, commercial, and residential projects. Viega is a

limited liability company organized under the laws of the State of Delaware with its U.S. headquarters located at 12303 Airport Way, Suite 395, Broomfield, Colorado 80021.  Its Northeast Distribution Center is maintained and operated in Harrisburg, Pennsylvania.  Viega acts as an agent for its parent corporation Viega GmbH & Co. KG, which is located in Atterndorn, Germany.

## III.    JURISDICTION AND VENUE

21.    NIBCO brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of suit, including reasonable attorneys' fees; to enjoin Viega's anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Viega's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 3 of the Clayton Act (15 U.S.C. § 14), and other state related claims.

22.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the causes of action asserted in this complaint arise under the laws of the United States.  This Court has supplemental jurisdiction over the causes of action asserted under state law pursuant to 28 U.S.C. § 1367 because the state law causes of action are so related to the causes of action within the Court's federal question jurisdiction that the state law causes of action form part of the same case or controversy.

23.     Defendant is subject to personal jurisdiction in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because it transacts business in this District, including through its distribution center in Harrisburg, Pennsylvania.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b)-(d) and 15 U.S.C. §§ 15 and 22 because Defendant resides, is doing business in, has and had agents in, and is found to transact business in this District.

## IV.    TRADE AND COMMERCE

25.     Viega has sold and continues to sell copper press fittings and carbon steel press fittings in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

26.     Viega's business activities were intended to and have had a substantial effect on interstate trade and commerce in the United States, including in this judicial district.

## V.    FACTUAL BACKGROUND

### A. Copper Press Fittings

27.     Copper pipe is the leading choice of contractors for plumbing, heating, and cooling applications.

28.     Copper pipe can be used for potable water service and distribution, industrial process water, air conditioning and refrigeration field service, compressed medical air, medical gas, drain/waste/vent applications, and HVAC applications.

The type of copper pipe to be used in a particular application is governed by plumbing and mechanical codes.

29.    Press technology refers to the use of hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and pipe. The joints rely on the sealing capability of a special fitting that contains an elastomeric gasket or seal (such as EPDM). Press technology takes advantage of copper's excellent malleability and its proven increase in strength when cold worked.

30.    Copper press fittings allow plumbers to complete projects with less time, budget and manpower. All that is required to install a copper press fitting is removing burrs from the outer and inner diameter of the pipe, sliding the fitting onto the pipe to minimum insertion depth, and pulling the trigger on a power tool. Installation can be completed in three to 30 seconds depending on the joint size. Moreover, the tools are lightweight, battery powered, and easy to handle, which allows installers to remain mobile.

31.    Copper press fittings also offer the advantage of flame-free installations. This eliminates flames, solder, flux, gas tanks, fumes, and noxious gases, as well as the need for a hot work permit, fire watch, and fire extinguishers. As a result, the job site is safer because piping systems can be installed in occupied spaces with no risk of a fire hazard.

32.    Three manufacturers account for over 90% of the copper press fittings sold in the United States: Viega, NIBCO and Elkhart Products Corporation ("EPC").

### 1.  Viega Copper Press Fittings

33.    Viega introduced its copper press fittings to North America in 1999. They are sold under the brand name ProPress® and are available in multiple configurations from ½" to 4" diameter.

34.    According to its marketing materials, Viega's copper press fittings are manufactured with the patented Viega Smart Connect® feature, which helps to identify connections that need to be pressed by allowing an unpressed fitting to leak during pressure testing.

35.    Viega has been and continues to have the highest market share of copper press fittings sold in the United States.  In 2016, Viega's net sales were approximately $115,000,000, which is approximately 71% of the U.S. copper press fittings market.

### 2.  NIBCO Copper Press Fittings

36.    NIBCO's copper press fittings are manufactured in Stuarts Draft, Virginia from 99% commercially pure copper.  They are sold under the brand name Press System® and are available in multiple configurations from ½" to 4" diameter.

37.    NIBCO's copper press fittings incorporate a V-Style or inboard bead design.  This design provides significant advantages because it offers two metal-to-

metal retention crimps, provides uniform seal compression, allows consistent jaw placement on the fitting, ensures proper tube alignment, and protects the seal both during the installation process and after installation, in service, by encapsulating the elastomeric seal with copper.

38.    NIBCO is Viega's most significant competitor in the market for copper press fittings.  In 2016, it had approximately 17% of the U.S. copper press fittings market, by net sales.

39.    On average, NIBCO's prices for copper press fittings are lower than Viega's prices for copper press fittings – sometimes as much as 15% lower.

### 3.  EPC Copper Press Fittings

40.    EPC introduced its copper press fittings in 2011.  They are sold under the brand name APOLLOPRESS® and are available in multiple configurations from ½" to 4" diameter.  According to its marketing materials, EPC's copper press fittings feature pre-lubricated seals and "Leak Before Press" technology.

41.    EPC is a minor player in the copper press fittings market.  In 2016, it had approximately 5% of the U.S. copper press fittings market, by net sales.

### B.  Carbon Steel Press Fittings for Black Iron Pipe

42.    Black iron pipe is a form of steel pipe that is less expensive and more malleable than other iron or steel pipes.  It has a black oxide scale on its surface, providing its name.

10

43.    The strength of black iron pipe makes it ideal for transporting gas or propane in rural and urban areas, and for delivering high pressure steam and air. The oil and petroleum industries use black iron pipe for moving large quantities of oil through remote areas. Other uses for black iron pipe include gas distribution inside and outside homes, water wells, sewage systems, and fire protection systems.

44.    Carbon steel press fittings, the press fittings for black iron pipe, rely on hydraulic power tools and jaws to press or crimp a joint to create a permanent seal between the fitting and pipe. The joints rely on the sealing capability of a special fitting that contains a sealing element.

45.    Viega represents in its marketing material that carbon steel press fittings allow plumbers to complete projects with less time, budget, and manpower. Viega also represents that carbon steel press fittings offer the advantage of flame-free installations, which eliminates the risk of a fire hazard.

46.    Viega was the first manufacturer to market a carbon steel, cold mechanical press system approved in the United States. Its carbon steel press fittings are sold under the brand names MegaPress® and MegaPress G®, and are available in configurations from ½" to 2" diameter. Viega's marketing material indicates that its carbon steel press fittings are designed exclusively for connection to and installation of black iron piping.

47.    According to Viega's marketing material, the MegaPress® is approved for use in hydronic heating, compressed air, fire sprinkler, and cooling water applications.  Its carbon steel press fittings have Viega's patented Viega Smart Connect® feature.  They also include an EPDM sealing element, a 304 stainless steel separator ring, and a 420 stainless steel grip ring.  The EPDM sealing element is approved for use in heating, cooling, and industrial systems ranging from fire protection and compressed air to chilled water.

48.    According to Viega's marketing material, the MegaPress G® is approved for use in fuel oil and fuel gas installations.  Its carbon steel press fittings have Viega's patented Viega Smart Connect® feature.  They also include an HNBR sealing element, a 304 stainless steel separator ring, and a 420 stainless steel grip ring.  The HNBR sealing element is approved for use in fuel, oil, lubricants and gasses ranging from diesel fuel and propane to natural gas.

49.    Viega's MegaPress® and MegaPress G® were the only carbon steel press fittings approved in the United States until July 2017.  As a result, Viega controls at least 95% of the carbon steel press fittings market.

## C. Distribution of Copper Press Fittings and Carbon Steel Press Fittings

50.    Demand for copper press fittings and carbon steel press fittings typically begins with an end user creating a project design that includes specifications for piping and other components to be used for the project.  Engineers

are usually responsible for drafting fittings specifications, which are often mandated by municipal code or by state or federal law.

51.    The project specifications are used to solicit bids from contractors. Once the contractors receive the specifications, they will solicit bids and other assistance from wholesale distributors that can supply various products for that project.

### 1. The Contractor and Wholesale Distributor Relationship

52.    Wholesale distributors employ sales personnel dedicated to servicing the needs of contractors, and can generally satisfy the needs of contractors with pre-existing inventory.

53.    Contractors rely on wholesale distributors because: (a) distributors offer a full spectrum of plumbing products; (b) distributors provide a single point of contact for all products; (c) distributors find alternate supply sources when needed; and (d) distributors have relationships with manufacturers and specification knowledge.

54.    Contractors generally source all of their project requirements from a single wholesale distributor, as a "one-stop" shop, because it allows the contractor to access service, payment, and delivery from a single source rather than duplicating administrative effort with multiple sources.

55.    Contractors typically select wholesale distributors based on price, service, and convenience.  Generally, contractors can negotiate better pricing when they have the option of purchasing fittings from multiple wholesale distributors.

56.    The wholesale distributor will supply the contractor either from its inventory or via a direct purchase order from the wholesale distributor to a fittings manufacturer who will deliver the product to the project site.

## 2. The Wholesale Distributor and Fittings Manufacturer Relationship

57.    Fittings manufacturers rely on wholesale distributors because: (a) distributors offer better sales coverage than the manufacturer would have with its own sales force alone; (b) distributors have more influence on and more knowledge of projects; (c) distributors free up a manufacturer's working capital by carrying inventory; (d) distributors offer one-stop shopping for the end user or its contractor; (e) distributors aggregate small orders from and shipments to contractors; (f) distributors help manufacturers get their products in specifications; and (e) distributors manage credit requests and absorb the risk of non-payment from contractors.

58.    In a free and competitive market, wholesale distributors may carry the product lines of multiple fittings manufacturers, which are selected by wholesale distributors based on customer demand, product quality, price, and historical relationship.

14

## VI.    RELEVANT MARKET

### A. Relevant Product Markets

59.    There are two relevant product markets in this case: the market for copper press fittings and the market for carbon steel press fittings.

60.    The markets for copper press fittings and carbon steel press fittings are distinct product markets because they are distinguishable in the eyes of fittings manufacturers, wholesale distributors, and end users for use with specific piping products.  Copper press fittings are designed to be used with copper piping and carbon steel press fittings are designed to be used with black iron piping.  Furthermore, the demand and pricing for copper press fittings and carbon steel press fittings are distinct.  For example, NIBCO does not track the price of carbon steel press fittings when setting the price of its copper press fittings.

61.    Copper press fittings are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product.  Copper press fittings are the only type of press fittings that can be used to join copper piping.

62.    Carbon steel press fittings are not reasonably interchangeable with any other product and do not have cross-elastic demand with any other product.  Carbon steel press fittings are the only type of press fittings that can be used to join black iron piping.

### B. <u>Relevant Geographic Market</u>

63.     The relevant geographic market, which applies to copper press fittings, is the United States.  Fittings manufacturers ship their products nationally from multiple locations to wholesale distributors located across the United States.

64.     The relevant geographic market, which applies to carbon steel press fittings, is the United States.  Fittings manufacturers ship their products nationally from multiple locations to wholesale distributors located across the United States.

### C. <u>Barriers to Entry</u>

65.     There are significant barriers to entry in the relevant markets.  These include both technological and regulatory barriers.  Effective entry into the relevant markets would require developing expertise in design engineering, obtaining certifications and approvals, securing placement on engineers' approval lists, and securing placement in specifications, which are often mandated by municipal code or by state or federal law.

66.     Additionally, the level of capital investment is significant.  An entrant would need to build its own foundry or develop a supply chain of foundries to produce fittings, develop or purchase hundreds of patterns or moldings necessary to make a full line of fittings, and establish relationships with end users, contractors, and wholesale distributors based on a reputation for quality and service.

16

67.     Viega's anticompetitive conduct as described herein has enhanced existing barriers to entry and has created new artificial barriers to effective entry into and expansion within the relevant markets.

## VII.     VIEGA'S MARKET POWER

68.     Viega has substantial market power in both relevant markets.

69.     Viega has a monopoly in the market for carbon steel press fittings.  Its carbon steel press fittings were the first to market and, until July 2017, the only carbon steel press fittings approved in the United States.  Viega controls at least 95% of the carbon steel press fittings market.

70.     Viega also possesses substantial market power in the market for copper press fittings.  In 2016, it controlled approximately 71% of the copper press fittings market.

## VIII.     VIEGA'S ANTICOMPETITIVE CONDUCT

71.     To maintain its dominant position in the market for copper press fittings, Viega uses its monopoly power in the carbon steel press fittings market to coerce customers not to purchase copper press fittings from NIBCO.

72.     Among other things, Viega has unlawfully tied the sale of carbon steel press fittings to the sale of its copper press fittings.  Viega has required customers who want to purchase Viega's carbon steel press fittings to also purchase copper

17

press fittings from Viega and not to purchase or stock copper press fittings from NIBCO.

73.    In other instances, Viega has charged a pricing penalty in the form of premium prices or lost multiplier discounts for its carbon steel press fittings if the customer purchases copper press fittings from NIBCO.  This pricing penalty forces customers to purchase Viega's copper press fittings because the combined purchase becomes the only economically viable option available to the customer.

74.    Viega's conduct has denied competitors such as NIBCO free access to the market for copper press fittings, not because Viega has a better product or lower price, but because of its power in the market for carbon steel press fittings.  At the same time, wholesale distributors and end users are forced to forego their free choice and pay higher prices.

75.    Viega's anticompetitive conduct directly targets NIBCO, which is Viega's only significant competitor in the market for copper press fittings.  When Viega representatives have threatened customers, they have explicitly stated that the customer must not purchase copper press fittings from NIBCO.

76.    As a result of Viega's conduct, NIBCO has lost existing and potential distributors for its copper press fittings, including, but not limited to, Weinstein Supply Company, Moore Supply Company, Mid-City Supply Co., Inc., American

Pipe & Supply Company, Charles D. Sheehy, Inc., Peabody Supply Company, and Western Nevada Supply.

### A. Weinstein Supply Company

77.    Weinstein Supply Company ("Weinstein") is a wholesale distributor selling plumbing, heating and air conditioning products throughout the Northeast of the United States.  Weinstein is a division of Hajoca Corporation, which is a wholesale distributor of plumbing, heating, and industrial supplies.

78.    In 2015, Weinstein's branch in Lansdowne, Pennsylvania converted from Viega to NIBCO's copper press fittings.  Thereafter, one of Weinstein's customers required carbon steel press fittings for multiple projects.  To satisfy the customer's request, Weinstein approached Viega to purchase its carbon steel press fittings.  In response, Viega informed Weinstein's purchasing manager that its carbon steel press fittings were available only if Weinstein switched back to Viega's copper press fittings.  Weinstein had no choice but to switch back to Viega's copper press fittings and stop selling NIBCO's copper press fittings.

79.    Because of Viega's conduct, NIBCO has lost sales of copper press fittings to Weinstein in an amount to be determined at trial.

### B. Moore Supply Company

80.    Moore Supply Company ("Moore Supply") is a wholesale distributor of plumbing products, pipe valves, and fittings for residential, commercial, and

industrial construction. It has locations throughout Texas. It is a sister company to Hajoca Corporation.

81.    In 2016, several branches of Moore Supply decided to convert to NIBCO copper press fittings. After some branches purchased copper press fittings from NIBCO, Viega threatened to pull its carbon steel press fittings from those branches. As a result, Moore Supply reversed its decision to purchase copper press fittings from NIBCO.

82.    Multiple branch managers informed NIBCO that Moore Supply had no choice but to purchase from Viega because of the possibility of losing Viega's carbon steel press fittings.

83.    Another incident involving Moore Supply occurred in the Dallas-Fort Worth area, where two Moore Supply branches purchased carbon steel press fittings and copper press fittings from Viega, and three different branches purchased copper press fittings from NIBCO. The branches supporting NIBCO's copper press fittings would purchase Viega's carbon steel press fittings from its sister branches.

84.    In response, Viega threatened to pull its carbon steel press fittings unless all of the branches (including those already purchasing from NIBCO) also purchased copper press fittings from Viega. As a result, Moore Supply stopped ordering copper press fittings from NIBCO.

20

85.    Because of Viega's conduct, NIBCO has lost sales of copper press fittings to Moore Supply in amount to be determined at trial.

### C. Mid-City Supply Co., Inc.

86.    Mid-City Supply Co., Inc. ("Mid-City") is a family-owned wholesale distributor that sells plumbing, HVAC, refrigeration, pipes, valves and fittings ("PVF"), and industrial products.  Mid-City's central distribution center is located in Elkhart, Indiana.  It also has branch offices in parts of Indiana and Michigan.

87.    Mid-City purchased copper press fittings from NIBCO until 2015. Mid-City converted to Viega's copper press fittings because Viega would not sell its carbon steel press fittings unless Mid-City agreed to drop NIBCO's copper press fittings from its inventory.  Although Mid-City wanted to continue purchasing copper press fitting from NIBCO, it switched because of Viega's threat to withhold its carbon steel press fittings.

88.    Because of Viega's conduct, NIBCO has lost sales of copper press fittings to Mid-City in an amount to be determined at trial.

### D. American Pipe & Supply Company

89.    American Pipe & Supply Company ("American Pipe") is a wholesale distributor located in Birmingham, Alabama.  It sells pipe, valves and fittings, plumbing fixtures, and fire sprinkler materials.

90.     In or about 2015, American Pipe stopped purchasing NIBCO's copper press fittings.  Customers were asking American Pipe for carbon steel press fittings and Viega required American Pipe to drop NIBCO's copper press fittings and buy only Viega's copper press fittings before it could purchase carbon steel press fittings from Viega.

91.     Because of Viega's conduct, NIBCO has lost sales of copper press fittings to American Pipe in an amount to be determined at trial.

### E.  Charles D. Sheehy, Inc.

92.     Charles D. Sheehy, Inc. ("Sheehy, Inc.") is an independent wholesale distributor located in Avon, Massachusetts.  It sells pipe, valves, fittings and mechanical equipment to the mechanical contracting industry of New England.

93.     In or about 2015, Viega shutdown one of its plants because of a fire.  As a result, Sheehy, Inc. started purchasing copper press fittings from NIBCO.  Approximately six months later, one of Sheehy, Inc.'s customers required carbon steel press fittings for a project.  As a result, Sheehy, Inc. asked Viega about the availability of its carbon steel press fittings.

94.     In response, Viega told Sheehy, Inc. that it had to drop NIBCO's copper press fittings to purchase Viega's carbon steel press fittings.  Although Sheehy, Inc. wanted to continue purchasing NIBCO's copper press fittings, it had no choice but to drop NIBCO to access the carbon steel press fittings for its customer.

22

95.    Because of Viega's conduct, NIBCO has lost sales of copper press fittings to Sheehy, Inc. in an amount to be determined at trial.

## F.    **Peabody Supply Company**

96.    Peabody Supply Company ("Peabody") is a wholesale distributor of plumbing products, pipe valves, and fittings.  It has locations throughout Massachusetts.  It is a division of the Hajoca Corporation.

97.    Approximately six months ago, a Viega representative walked into one of Peabody's branch locations and conducted an inventory check.  The purpose of the inventory check was to monitor the products being carried by Peabody.

98.    During the encounter, the Viega representative told Peabody personnel that Viega would pull its carbon steel press fittings line from all of Peabody's branches if any of them stocked NIBCO's copper press fittings.  As a result, Peabody had no choice but to stop purchasing copper press fittings from NIBCO.

99.    Because of Viega's conduct, NIBCO has lost sales of copper press fittings to Peabody in an amount to be determined at trial.

## G.    **Western Nevada Supply**

100.    Western Nevada Supply ("WNS") is a wholesale distributor that offers a diverse line of products including plumbing, water works, HVAC, PVF, Irrigation, and Hydronics & Solar.  It has locations in Nevada and California.

101. Approximately two years ago, WNS stocked NIBCO copper press fittings. Viega required WNS to drop NIBCO's copper press fittings and buy only Viega's copper press fittings before WNS could purchase carbon steel press fittings from Viega. As a result, WNS was forced to stop purchasing copper press fittings from NIBCO so that it could obtain Viega's carbon steel press fittings.

102. Because of Viega's conduct, NIBCO has lost sales of copper press fittings to WNS in an amount to be determined at trial.

## IX. ANTICOMPETITIVE EFFCTS

### A. <u>Viega's Conduct Has Caused Substantial Anticompetitive Effects</u>

103. Viega's anticompetitive practices as alleged herein have restrained trade, and have preserved and entrenched Viega's market power. Viega's conduct has harmed competition in the market for copper press fittings and has caused injury to NIBCO. Those injuries are intertwined and inseparable. Marginalizing or eliminating NIBCO as a competitor in the copper press market is an integral aspect of Viega's anticompetitive conduct.

104. Viega's conduct has robbed consumers of NIBCO's procompetitive and price-lowering influence in the market for copper press fittings. On average, NIBCO's prices for its copper press fittings are lower than Viega's prices for copper press fittings – sometimes as much as 15% lower. As a result, Viega's

anticompetitive conduct has decreased price competition in the copper press fittings market and deprived consumers of free choice.

105.  Viega has profited, and continues to profit, from its unlawful conduct to the detriment of consumers.

106.  Wholesale distributors are injured because they are: (a) forced to pay higher prices for copper press fittings caused by decreased competition between fittings manufacturers; (b) deprived of the freedom to make competitive choices about which copper press fittings should be stocked and used; and (c) deprived of the benefit of continuous innovation.  End users are similarly injured because they also pay higher prices and because they are deprived the freedom of choice.

107.  There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts.  There is no legitimate business reason to prevent copper press fittings and carbon steel press fittings from being sold separately.  Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

## B.  Viega's Anticompetitive Conduct Has Injured NIBCO

108.  Viega's anticompetitive conduct directly targets NIBCO.  It has deprived NIBCO of existing and potential customers for its copper press fittings.  As

a result, NIBCO has suffered and continues to suffer injury from Viega's preservation of its monopoly.

109.    Absent Viega's anticompetitive conduct, NIBCO's revenues would be substantially greater and its competitive influence would have a downward effect on pricing in the copper press market.

110.    There are no aspects of Viega's conduct that are beneficial to competition.  NIBCO's injury is an integral aspect of Viega's unlawful conduct; flows from that which renders Viega's conduct unlawful; and it is the type injury the antitrust laws were intended to prevent.

111.    NIBCO's injury is inseparable from the alleged harm to competition.

112.    Viega's unlawful conduct will continue unless injunctive and equitable relief is granted.

## COUNT I
### (Unlawful Tying – Sherman Act Section 1 and Clayton Act Section 3)

113.    NIBCO incorporates its allegations in paragraphs 1–112 as if fully stated herein.

114.    Viega has engaged in an unlawful tying scheme in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act.

115.    Viega has tied its carbon steel press fittings (the tying product) to the purchase of it copper press fittings (the tied product) by (a) withholding its carbon

26

steel press fittings altogether unless the distributor agrees to purchase Viega's copper press fittings, or (b) requiring wholesale distributors to pay higher prices for carbon steel press fittings if they still purchase copper press fittings from anyone other than Viega.    Viega conditions the availability of its carbon steel press fittings to distributors on the purchase of its copper press fittings to the exclusion of NIBCO's copper press fittings.

116.    Copper press fittings and carbon steel press fittings are separate and distinct products that are used for different applications and are not functionally interchangeable.    The product characteristics, uses and character of copper press fittings – which are used with copper pipes for potable, hot, chilled and process water applications for plumbing and HVAC systems – are different from the product characteristics, uses and the character of demand for carbon steel press fittings – which may be used with black iron pipes for fuel oil and fuel gas installations.

117.    At all times relevant to this action, Viega had market power in the market for the sale of carbon steel press fittings in the United States.    Viega controls at least 95% of the carbon steel press fittings market.    Moreover, there are high barriers to entry in the market for carbon steel press fittings, including both technological and regulatory barriers.

118.    Viega uses its market power in the carbon steel press fittings market to coerce wholesale distributors to purchase Viega's copper press fittings rather than

NIBCO's less expensive copper press fittings, and higher prices are then paid by consumers.

119.  Viega's conduct has stifled competition on the merits in the copper press fittings market.

120.  The amount of interstate commerce affected by Viega's tying scheme is not insubstantial.  In 2016, Viega's net sales of copper press fittings in the United States were approximately $115,000,000.

121.  Viega's conduct in conditioning the sale of its carbon steel press fittings on the purchase of its copper press fittings constitutes an illegal tying agreement and is a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) or, in the alternative, is unlawful under the rule of reason, in that any purported pro-competitive justification for the tie is substantially outweighed by the anticompetitive effects in the copper press fittings market.

122.  There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts.  Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

123.  If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure NIBCO, other competitors, and competition.

124.   As a direct, substantial, proximate and immediate result of Viega's anticompetitive and unlawful actions, NIBCO has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial.

**COUNT II**
**(Contracts in Restraint of Trade – Sherman Act Section 1)**

125.   NIBCO incorporates its allegations in paragraphs 1–124 as if fully stated herein.

126.   At all times relevant to this action, Viega had market power in the market for the sale of copper press fittings in the United States.  Viega controls approximately 71% of the copper press fittings market in the United States. Moreover, there are high barriers to entry in the market for copper press fittings, including both technological and regulatory barriers.

127.   Viega has forced wholesale distributors into agreements that prohibit such wholesale distributors from purchasing copper press fittings from NIBCO if the wholesale distributors also want to purchase Viega's carbon steel press fittings.

128.   Viega's conduct constitutes an unlawful contract in restraint of trade or commerce in violation of Section 1 of the Sherman Act.

129.   The purpose and effect of the agreements was to diminish, eliminate, and exclude competition.

130.   Through its unlawful contracts, Viega has unlawfully injured competition by, among other things alleged in this complaint, forcing end users and wholesale distributors to absorb the increased costs caused by decreased price competition, and depriving end users and wholesale distributors of the freedom of choice, as well as the benefit of continuous innovation.

131.   There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts.  Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

132.   If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure NIBCO, other competitors, and competition.

133.   As a direct, substantial, proximate and immediate result of Viega's anticompetitive and unlawful actions, NIBCO has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial.

## COUNT III
### (Monopolization – Sherman Act Section 2)

134.   NIBCO incorporates its allegations in paragraphs 1–133 as if fully stated herein.

135.   At all times relevant to this action, Viega had monopoly power in the market for the sale of copper press fittings in the United States.  Viega controls

approximately 71% of the copper press fittings market in the United States. Moreover, there are high barriers to entry in the market for copper press fittings, including both technological and regulatory barriers.

136.   Viega has engaged in anticompetitive conduct designed to prevent competition on the merits in the market for copper press fittings, and thereby willfully maintain or enhance its monopoly position in that market.

137.   Viega's anticompetitive conduct has decreased price competition in the copper press fittings market and deprived consumers of free choice.  Viega has profited, and continues to profit, from its unlawful conduct to the detriment of consumers.

138.   There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts.  Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

139.   If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure NIBCO, other competitors, and competition.

140.   As a direct, substantial, proximate and immediate result of Viega's anticompetitive and unlawful actions, NIBCO has been injured in its business property, trade, reputation and competitive position in an amount to be established at trial.

<u>**COUNT IV**</u>
**(Attempted Monopolization – Sherman Act Section 2)**

141.   NIBCO incorporates its allegations in paragraphs 1–140 as if fully stated herein.

142.   Viega specifically intended to monopolize the market for the sale of copper press fittings in the United States.

143.   Viega's anticompetitive conduct, which restrained trade and competition in the market for copper press fittings and enabled Viega to avoid pricing pressure, constitutes an improper attempt to use its monopoly power in the market for carbon steel press fittings for the specific purpose of monopolizing the copper press fittings market.

144.   In furtherance of this attempt, Viega has engaged in anticompetitive conduct, as alleged herein, to stifle competition in the copper press fittings market.

145.   Viega's anticompetitive conduct has decreased price competition in the copper press fittings market and deprived consumers of free choice.  Viega has profited, and continues to profit, from its unlawful conduct to the detriment of consumers.

146.   There are no legitimate business or pro-competitive justifications for Viega's conduct and any purported legitimate business justifications are mere pretexts.  Even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

32

147.   If not enjoined, Viega will continue to engage in anticompetitive conduct that will further injure NIBCO, other competitors, and competition.

148.   Should Viega be successful in maintaining its desired anticompetitive conduct, there is a dangerous probability it will succeed in achieving monopoly power in the copper press fittings market.

149.   As a direct, substantial, proximate and immediate result of Viega's attempt to monopolize the market, NIBCO has been injured in its business, property, trade, reputation and competitive position in an amount to be established at trial. Should Viega be successful in improperly gaining a monopoly, NIBCO will be further injured as a result of Viega's anticompetitive conduct.

## COUNT V
### (Tortious Interference)

150.   NIBCO incorporates its allegations in paragraphs 1–149 as if fully stated herein.

151.   NIBCO had an existing business relationship or a reasonable expectation of entering into a valid business relationship with Moore Supply, Weinstein, Mid-City Supply, American Pipe, Sheehy, Inc., Peabody, WNS and other wholesale distributors for the sale of copper press fittings.

152.   Viega had knowledge of NIBCO's business relationship or prospective business relationship with each of these entities.

153.   Viega, in the many ways described herein, intentionally and unjustifiably, without privilege or justification, interfered with that business relationship or prospective business relationship.

154.   Viega acted wrongfully with the intent to harm NIBCO.

155.   Viega's tortious conduct harmed NIBCO in the manner alleged herein.

156.   NIBCO had a reasonable probability of receiving the anticipated economic benefit.

157.   NIBCO has been injured and suffered damages as a result of Viega's interference, including, but not limited to, lost profits resulting from sales of copper press fittings to existing and potential customers.

## JURY DEMAND

158.   Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, NIBCO requests that the Court enter judgment in its favor and against Defendant for:

a.   Actual damages in an amount to be determined at trial;

b.   Treble damages;

c.   Reasonable attorneys' fees and costs;

d.   Punitive damages;

34

e.  A permanent injunction against Viega from any further conduct calculated to prevent NIBCO from contracting with wholesale distributors; and

f.  Such other relief as the Court deems just and proper.

Dated:  September 26, 2017                    Respectfully submitted,

                                              /s/ Laura A. Lange
                                              Laura A. Lange
                                              Pa. ID. No. 310733
                                              McGUIREWOODS LLP
                                              Tower Two-Sixty
                                              260 Forbes Avenue, Suite 1800
                                              Pittsburgh, PA 15222-3142
                                              Tele: (412) 667-7941
                                              llange@mcguirewoods.com

                                              Amy B. Manning
                                              Angelo M. Russo
                                              Sarah A. Zielinski
                                              McGUIREWOODS LLP
                                              77 West Wacker Drive, Suite 4100
                                              Chicago, Illinois 60601
                                              Tele:  (312) 849-8100
                                              amanning@mcguirewoods.com
                                              arusso@mcguirewoods.com
                                              szielinski@mcguirewoods.com
                                              (*pro hac vice applications forthcoming*)

                                              *Attorneys for Plaintiff NIBCO Inc.*