## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NIBCO INC.,** | : | **CIVIL ACTION NO. 1:17-CV-1739** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **VIEGA LLC,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff NIBCO Inc. ("NIBCO") commenced the above-captioned action against defendant Viega LLC ("Viega"), a competitor in the copper press fittings market, asserting violations of federal antitrust and state tort law.  Viega moves to dismiss NIBCO's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court will deny Viega's motion.

## I.    Factual Background and Procedural History

NIBCO is a manufacturer of fittings, valves, and flow control solutions used in residential, commercial, industrial, and institutional construction.  (Doc. 1 ¶ 19).  It is headquartered in Elkhart, Indiana.  (Id.)  Viega manufactures and distributes plumbing, heating, and pipe joining systems for use in industrial, commercial, and residential projects.  (Id. ¶ 20).  Viega is organized under the laws of Delaware, headquartered in Colorado, and has its Northeast Distribution Center in Harrisburg, Pennsylvania.  (Id.)  The instant litigation arises from allegations that Viega unlawfully conditions sales of its carbon steel press fittings on the purchase of

Viega copper press fittings, which unlawfully reduces consumer choice and perpetuates Viega's dominant share of both markets.

## A.    Copper Press Fittings

According to the complaint, copper pipe is the leading choice among contractors for plumbing, heating, and cooling installations.  (Id. ¶ 27).  NIBCO explains that "press technology" is a method of joining copper pipes using copper press fittings.  (Id. ¶ 29).  The technology uses power tools and jaws to "press or crimp a joint" and "create a permanent seal between the fitting and pipe."  (Id.)  NIBCO alleges that copper press fittings are unique among all other types of copper pipe connectors for several reasons: (1) they reduce time, budget, and manpower, and use lightweight installation tools; (2) they reduce hazards in the workplace by allowing "flame-free installations"; and (3) they are the only type of press fitting compatible with copper piping.  (Id. ¶¶ 30-31, 61).  NIBCO further alleges that, because of these distinguishing features, copper press fittings are not reasonably interchangeable with other products, and demand for copper press fittings does not respond to changes in price for other types of copper pipe connectors.  (See id. ¶ 61).

Three manufacturers make up over 90% of the copper press fittings market in the United States: Viega, which controls 71% of the market; NIBCO, which holds 17% market share; and Elkhart Products Corporation, which holds 5% market share.  (Id. ¶¶ 32, 35, 38, 41).  In 2016, Viega had net copper press fittings sales of $115,000,000 in the United States.  (Id. ¶ 35).  Based on this figure and the market share percentages, we discern that NIBCO's net sales in 2016 were approximately

$27,500,000.  (See id. ¶¶ 35, 38).  NIBCO alleges that its copper press fittings are offered at prices as much as 15% lower than Viega's prices.  (Id. ¶ 39).

**B.    Carbon Steel Press Fittings**

Black iron pipe is used in the oil and petroleum industry for transporting gas and propane, as well as in water wells, sewage systems, and fire protection systems.  (Id. ¶ 43).  Carbon steel press fittings are used to connect black iron pipe in the same manner that copper press fittings are used to connect copper pipe.  (Id. ¶ 44).  Carbon steel press fittings have the same distinguishing features as copper press fittings, *viz.*, superior efficiency and safety in installation.  (Id. ¶ 45).  Carbon steel press fittings are the only type of press fitting compatible with black iron pipe.  (Id. ¶ 62).  According to NIBCO, there is no equivalent substitute for carbon steel press fittings on the market, and demand for these fittings is not affected by price changes for other black iron pipe connectors.  (See id.)

Viega was the first manufacturer approved to sell carbon steel press fittings in the United States.  (Id. ¶ 46).  Viega was the only manufacturer of carbon steel press fittings approved in the domestic market until July of 2017.  (Id. ¶ 49).  Viega consequently controls at least 95% of the United States market for carbon steel press fittings.  (Id.)

**C.    Alleged Tying Activities**

Demand for press fittings begins with the creation of a project design incorporating specifications for piping.  (Id. ¶ 50).  An engineer will draft fittings specifications, which, according to the complaint, are often governed by municipal code or state or federal law.  (Id.)  Project specifications are then sent to contractors

3

to solicit bids.  (Id. ¶ 51).  Contractors, in turn, work with wholesale distributors to source materials for the project.  (Id.)  Contractors generally work with a single wholesaler distributor as a "one-stop shop" for all requirements for a given project. (Id. ¶ 54).

NIBCO alleges that Viega has wielded its dominance in the carbon steel press fittings market to control the copper press fittings market.  (Id. ¶ 71).  NIBCO avers that Viega has made sale of its carbon steel press fittings contingent on the customer's agreement not to purchase copper press fittings from NIBCO.  (See id. ¶ 72).  NIBCO also avers that, in some instances, Viega charges penalties in the form of lost discounts or outright higher prices to those customers who continue to stock copper press fittings from NIBCO.  (Id. ¶¶ 73, 115).

To illustrate these claims, NIBCO identifies seven examples of wholesale distributors who have purportedly stopped selling NIBCO's copper press fittings in response to Viega's threats.  Those examples are:

∞ Weinstein Supply Company ("Weinstein"), a wholesaler distributing products throughout the northeast United States, a branch of which stocked NIBCO's copper press fittings until a customer required carbon steel press fittings and Viega forced Weinstein to drop NIBCO's copper press fittings line in order to obtain Viega's carbon steel press fittings;

∞ Moore Supply Company ("Moore Supply"), a wholesale distributor with locations throughout Texas, which carried NIBCO's copper press fittings until Viega threatened to cut off supply of its carbon steel press fittings if several Moore Supply branches did not stop carrying NIBCO's copper press fittings line;

∞ Mid-City Supply Co., Inc. ("Mid-City Supply"), a wholesale distributor located in Indiana, which stocked NIBCO's copper press fittings until 2015, when it switched to Viega because "Viega would not sell its carbon

steel press fittings unless Mid-City [Supply] agreed to drop NIBCO's copper press fittings from its inventory";

∞ American Pipe & Supply Company ("American Pipe"), a wholesale distributor located in Alabama, which dropped NIBCO's copper press fittings in 2015 because customers were in need of carbon steel press fittings and Viega would not supply them unless American Pipe stopped carrying NIBCO's copper press fittings and stocked Viega's instead;

∞ Charles D. Sheehy, Inc. ("Sheehy, Inc."), a wholesale distributor in Massachusetts selling product throughout New England, which was forced by Viega to stop carrying NIBCO's copper press fittings and carry only Viega's copper press fittings in order to purchase Viega's carbon steel press fittings to fulfill customer requests;

∞ Peabody Supply Company ("Peabody"), a wholesale distributor with locations throughout Massachusetts, a branch of which was visited by a Viega representative for an inventory check in March 2017 and during which visit the Viega representative advised Peabody staff "that Viega would pull its carbon steel press fittings line from all of Peabody's branches if any of them stocked NIBCO's copper press fittings"; and

∞ Western Nevada Supply ("Western Nevada"), a wholesale distributor with locations in Nevada and California, which Viega forced to convert from NIBCO's copper press fittings to Viega's copper press fittings in order to stock Viega's carbon steel press fittings.

(Id. ¶¶ 77-102). NIBCO alleges that it has lost sales with these distributors and others as a result of Viega's conduct. (Id. ¶¶ 76, 79, 85, 88, 91, 95, 99, 102, 108-110).

NIBCO also alleges that free market competition is harmed by Viega's conduct in that Viega (1) denies competitors free access to the market for copper press fittings not on merit but because of its power in the carbon steel press fittings market, (2) forces engineers, contractors, and wholesale distributors to forego their free choice among manufacturers and to pay a higher price, and (3) deprives consumers of NIBCO's "pro-competitive and price-lowering influence" in the copper press fittings market. (Id. ¶¶ 104, 106).

### D. Procedural History

NIBCO commenced this action with the filing of a five-count complaint. NIBCO asserts the following causes of action: in Count I, a claim for unlawful tying in violation of Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, and Section 3 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. § 14; in Count II, a claim alleging contracts in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; in Counts III and IV, respectively, claims for monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and in Count V, a claim under Pennsylvania law for tortious interference with existing and prospective business relations. Viega moves to dismiss the complaint in its entirety. The motion is fully briefed and ripe for disposition.[1]

## II. <u>Legal Standard</u>

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008) (quoting <u>Pinker v. Roche Holdings, Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts

---

[1] Viega also filed a request for oral argument on its motion to dismiss. The court finds oral argument unnecessary to disposition of the instant motion.

contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

III. **Discussion**

Viega's motion tests the sufficiency of NIBCO's complaint with a fourfold challenge. Viega asserts, *first*, that NIBCO has failed to plead relevant product and

geographic markets; *second*, that NIBCO's antitrust claims fail on their merits; *third*, that NIBCO lacks antitrust standing; and *fourth*, that NIBCO's state law claim for tortious interference with existing and prospective business relations fails to state a claim for which relief may be granted.

## A. Antitrust Claims

NIBCO's antitrust claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. Section 1 of the Sherman Act proscribes contracts "in restraint of trade or commerce." Id. § 1. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize," trade or commerce. Id. § 2. Section 3 of the Clayton Act prohibits the practice of conditioning a sale or contract for sale of goods on the purchaser's agreement not to purchase goods from a competitor. Id. § 14. To prevail on a claim under any of these statutory sections, NIBCO must articulate relevant product and geographic markets within which the court can assess Viega's market power. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436-37, 442-43 (3d Cir. 1997). Accordingly, we begin our analysis with Viega's argument that NIBCO has failed to articulate legally cognizable product and geographic markets.

### 1. *Relevant Product Market*

A court determines the "outer boundaries" of a relevant product market by looking to "reasonable interchangeability of use" between the product itself and the alleged substitutes for it. Id. at 436, 437 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); Tunis Bros. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)) (citing Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482

(1992)). A product is reasonably interchangeable if it is "roughly equivalent to another for the use to which it is put." <u>Allen-Myland, Inc. v. IBM Corp.</u>, 33 F.3d 194, 206 (3d Cir. 1994). Relevant factors include "price, use, and qualities" of the respective products. <u>Queen City Pizza, Inc.</u>, 124 F.3d at 437 (quoting <u>Tunis Bros.</u>, 952 F.2d at 722). The Third Circuit Court of Appeals has stated that the "key test" for determining interchangeability is whether there is cross-elasticity of demand, *i.e.*, "whether the demand for the second good would respond to changes in the price of the first." <u>Allen-Myland, Inc.</u>, 33 F.3d at 206 (citing <u>Tunis Bros.</u>, 952 F.2d at 722).

Courts have historically been reluctant to reject proposed relevant market definitions at the pleading stage. Indeed, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." <u>Queen City Pizza, Inc.</u>, 124 F.3d at 436. However, the Third Circuit has explicitly rejected a "*per se* prohibition against dismissal of antitrust claims" on a Rule 12 motion. <u>Id.</u> at 436-37. Dismissal may be appropriate in cases in which a plaintiff (1) "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." <u>Id.</u> (collecting cases). In other words, accepting the facts in the complaint as true, we ask whether the market articulated in the complaint is "implausible." <u>Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.</u>, 806 F.3d 162, 183 (3d Cir. 2015).

We cannot conclude, at this early stage, that NIBCO's proposed product markets are "implausible." NIBCO identifies two product markets: copper press fittings and carbon steel press fittings. (Doc. 1 ¶ 59). NIBCO articulates a plausible rationale for narrowing its product market definition to include all products within two particular subsets of pipe fittings as opposed to defining the market to include all types of pipe fittings more broadly. (See id. ¶¶ 60-61). NIBCO avers that copper press fittings and carbon steel press fittings are distinguishable from other fitting options in the eyes of manufacturers, wholesale distributors, and end users for use with particular types of piping. (Id. ¶ 60). And NIBCO avers that, given the unique qualities of copper press fittings and carbon steel press fittings, neither product has cross-elastic demand with any other fitting product. (Id. ¶¶ 61-62).

Viega rejoins that NIBCO fails to "encompass all interchangeable substitute products" or to justify its narrow market definition. (Doc. 24 at 6-11; Doc. 26 at 5-6). The decisional law does not hold that *every* narrowly-drawn market fails as a matter of law. The question is one of reasonable interchangeability and rough equivalency. Queen City Pizza, Inc., 124 F.3d at 437 (citing Eastman Kodak Co., 504 U.S. at 482; Brown Shoe Co., 370 U.S. at 325; Tunis Bros., 952 F.2d at 722). A plaintiff seeking to exclude ostensible substitute products must plead facts distinguishing a proposed submarket from those ostensible substitutes. See Hanover 3201 Realty, 806 F.3d at 183. A decision cited by Viega, B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162 (S.D.N.Y. 1995), underscores this point, indicating that a plaintiff who excludes arguable substitutes from its definition must "offer an

explanation for why they are defining the relevant product market in such narrow terms." <u>Hologic, Inc.</u>, 909 F. Supp. at 172.

We find that NIBCO has satisfied this burden for purposes of Rule 12(b)(6). NIBCO pleads a plausible basis to support its assertion that copper press fittings and carbon press fittings are not reasonably interchangeable with other types of pipe fittings. NIBCO describes several features which set copper and carbon steel press fittings apart and render them distinct in the universe of pipe fitting options, to wit: (1) both types of press fittings are far more efficient and reduce time, budget, and manpower for projects and require lightweight installation tools; (2) both press fittings also permit "flame-free installations," reduce hazards in the workplace, and result in a safer work environment; and (3) copper press fittings are the only type of press fitting compatible with copper piping, and carbon steel press fittings are the only type of press fitting compatible with black iron piping. (Doc. 1 ¶¶ 30-31, 45, 61-62). Whether NIBCO's *allegata* square with the eventual *probata*, and whether "factual inquiry into the commercial realities faced by consumers" reveals a market as described by NIBCO, <u>see</u> <u>Queen City Pizza</u>, 124 F.3d at 436, remains to be seen.

At this juncture, we cannot find the relevant product markets of copper press fittings and carbon steel press fittings to be implausible.[2]

## 2. *Relevant Geographic Market*

An antitrust plaintiff must also define a relevant geographic market. "[T]he relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." Hanover 3201 Realty, 806 F.3d at 183-84 (alteration in original) (quoting Eichorn v. AT&T Corp., 248 F.3d 131, 147 (3d Cir. 2001)). The geographic market "may be local, regional, national[,] or international in origin." In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 697 (E.D. Pa. 2007) (citing Brown Shoe Co., 370 U.S. at 337). These broad parameters notwithstanding, cursorily delineating a geographic boundary "without reference to a market as perceived by consumers and suppliers," will not satisfy the antitrust plaintiff's burden. Tunis Bros., 952 F.2d at 727.

---

[2] We note briefly that the authority cited by Viega in support of dismissal is largely inapposite. In Sheet Metal Duct, Inc. v. Lindab, Inc., No. 99-6299, 2000 WL 987865, at *4-5 (E.D. Pa. July 18, 2000), the court rejected the plaintiff's attempt to narrow the relevant product market to a single patented brand. A second case cited by Viega, B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995), concerned a failure to offer any explanation whatsoever for defining the relevant market in very narrow terms. The remaining cases cited by Viega either attempted to limit the relevant product market to a single brand or failed to allege facts distinguishing the narrowly-drawn product market from potential substitutes. See, e.g., Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1118-19 (10th Cir. 2008) (dismissing complaint that narrowed relevant market for monopsony claim to single group of consumers); Prime Aid Pharm. Corp. v. Humana, Inc., No. 16-2104, 2017 WL 3420933, at *3 (D.N.J. Aug. 9, 2017) (dismissing complaint that attempted to limit relevant market to "single-brand market"); see also Fresh Made, Inc. v. Lifeway Foods, Inc., No. 01-4254, 2002 WL 31246922, at *5-6 (E.D. Pa. Aug. 9, 2002) (dismissing complaint for failure to allege facts distinguishing specialty market for Russian dairy products, including kefir, from market for yogurt, drinkable yogurt products, or dairy products generally).

NIBCO avers that the relevant geographic market for both copper press fittings and carbon steel press fittings is the United States. NIBCO alleges that manufactures of both types of fittings ship their products from "multiple locations to wholesale distributors located across the United States." (Doc. 1 ¶¶ 63-64). With respect to copper press fittings, NIBCO alleges that consumers in the United States purchase 88% of their copper press fittings from two domestic manufacturers, Viega (headquartered in Colorado with a distribution center in Harrisburg, Pennsylvania) and NIBCO (headquartered in Indiana).[3] As for carbon steel press fittings, NIBCO avers that Viega's fittings were the only brand approved in the United States until 2017, such that Viega holds 95% of the domestic market share. (Id. ¶¶ 6, 49). These allegations strongly suggest that buyers in the domestic market generally do not look beyond the United States to purchase copper and carbon steel press fittings.

Viega argues that NIBCO's complaint is deficient because it fails to justify exclusion of international manufacturers from the relevant market definition. We reject this assertion and, for the reasons stated above, hold that NIBCO adequately explains the geographic lines drawn. Moreover, at least one court has opined that failure to "account for foreign producers" will not defeat an otherwise thoughtfully delimited geographic market at the Rule 12(b)(6) stage. *In re* Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d at 698. We find this approach to be

---

[3] NIBCO identifies a third manufacturer, Elkhart Products Corporation, which it avers holds 5% of the United States market share for copper press fittings. (See Doc. 1 ¶¶ 32, 40-41). It is not clear from the complaint whether Elkhart Products Corporation is a domestic corporation.

appropriate, particularly given the domestic market share figures alleged by NIBCO. We conclude that NIBCO's claimed geographic market is plausible.

### 3. *Count I: Unlawful Tying*

NIBCO alleges in Count I that Viega has engaged in an unlawful tying scheme, to wit: tying its carbon steel press fittings (the "tying" product) to purchase of its copper press fittings (the "tied" product). A plaintiff can establish antitrust liability for tying in two ways: a *per se* claim, or a "rule of reason" claim. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 511 (3d Cir. 1998). NIBCO rests its tying claim primarily on the *per se* theory of liability, invoking the rule of reason in the alternative. (Doc. 1 ¶ 121).

To state a claim for *per se* tying liability under the Sherman Act, a plaintiff must establish that: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is affected." Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 477 (3d Cir. 1992) (*en banc*); Kickflip, Inc. v. Facebook, Inc., 999 F. Supp. 2d 677, 689 (D. Del. 2013) (quoting Town Sound, 959 F.2d at 477). When a plaintiff satisfies these three elements, the tying practice is "automatically unlawful" and the plaintiff need not present further proof of anticompetitive effect. Town Sound, 959 F.2d at 477 (citing N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)). The *per se* test asks whether "exploitation of leverage in the market for the tying product is 'probable.'" Brokerage Concepts, Inc., 140 F.3d at 512 (citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 15 (1984), abrogated on other

grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006); Town Sound,

959 F.2d at 476-77).

Viega does not challenge the first element in its Rule 12 briefing.  That

Viega has tied the purchase of carbon steel press fittings to purchase of its copper

press fittings is supported amply by NIBCO's complaint.  Viega instead disputes the

second and third element of NIBCO's *per se* tying claim.

### i.    Market Power

We turn first to the question of market power.[4]  NIBCO must establish that

Viega possesses "appreciable economic power in the tying market," *viz.*, the market

for carbon steel press fittings.  See Eastman Kodak Co., 504 U.S. at 464 (internal

quotation marks omitted); Brokerage Concepts, Inc., 140 F.3d at 516 (quoting

Eastman Kodak Co., 504 U.S. at 464).  "The existence of such power ordinarily is

inferred from the seller's possession of a predominant share of the [tying] market."

Eastman Kodak Co., 504 U.S. at 464 (collecting cases).  Nonetheless, market share is

not the only means by which a plaintiff may establish that the defendant possessed

market power sufficient to obtain *per se* liability.  Allen-Myland, Inc., 33 F.3d at 209.

Courts may examine other factors, including, *inter alia*, barriers to market entry, if

market share alone does not establish market power.  See, e.g., id. at 209-10.

---

[4] Part of Viega's market power argument rests on its belief that NIBCO
has too narrowly defined the relevant markets.  Viega's arguments against each
of NIBCO's remaining claims likewise rest, in part, on its challenge to the market
definition.  Because we find NIBCO's market delineation to be plausible, we reject
this aspect of Viega's arguments at this stage without prejudice to Viega's right to
reassert the argument at a later phase of this litigation if the record does not
support relevant market boundaries as currently defined.

According to the complaint, Viega's carbon steel press fittings were the only carbon steel press fittings approved in the domestic market until 2017. (Doc. 1 ¶ 49). NIBCO alleges that, despite the emergence of a new entrant in 2017, Viega still "controls at least 95% of the carbon steel press fittings market." (Id. ¶¶ 6, 49, 69). Such near-total control of a market is generally sufficient to plead market power for antitrust purposes. See Eastman Kodak Co., 504 U.S. at 481 (100% and 80% to 95% market share sufficient at summary judgment); see, e.g., Kickflip, 999 F. Supp. 2d at 689 (90% market share sufficient at pleading stage); cf. Brokerage Concepts, Inc., 140 F.3d at 516-17 (market share below 30% not enough). NIBCO's allegations establish that Viega possesses predominant control of the United States' carbon steel press fittings market.

NIBCO supplements its market share averments by alleging facts plausibly establishing high barriers to entry in the carbon steel press fittings market. The Third Circuit Court of Appeals has held that "the ease or difficulty with which competitors enter the market is an important factor in determining whether the defendant has true market power." Allen-Myland, Inc., 33 F.3d at 209. NIBCO alleges that the carbon steel press fittings market involves significant technical and regulatory barriers and a considerable level of capital investment. (Doc. 1 ¶¶ 65-66). The complaint facially establishes that new companies attempting to enter the carbon steel press fittings market face significant hurdles. These considerations amplify the market power flowing from Viega's substantial market share.

Viega submits that NIBCO's allegations of market power are undermined by the fact that the domestic carbon steel press fittings market is in a nascent state

with a new manufacturer entering the market within the past year. (Doc. 24 at 16-17). The Third Circuit has not yet spoken as to whether new market entry entirely forecloses a finding of market power in the manner that Viega suggests. Several courts of appeals, however, have rejected such a rule. See McWane, Inc. v. FTC, 783 F.3d 814, 831-32 (11th Cir. 2015) (quoting Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1440 (9th Cir. 1995); Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 971 (10th Cir. 1990); Oahu Gas Serv., Inc. v. Pac. Res. Inc., 838 F.2d 360, 366-67 (9th Cir. 1988)). We are disinclined to hold, without the benefit of a factual record, that entry of a single competitor into the market, particularly when the defendant nonetheless retains at least 95% market share, vitiates market power.[5]

### ii.    Substantial Effect

NIBCO must also allege that "a substantial amount of interstate commerce" has been affected by the tying arrangement. Brokerage Concepts, Inc., 140 F.3d at 512-13 (citing Town Sound, 959 F.2d at 477). The Supreme Court has held that the effect of the tie must be "substantial enough in terms of dollar-volume so as not to be merely *de minimis*." Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 501 (1969); see Allen-Myland, Inc., 33 F.3d at 201 (quoting Fortner Enters., Inc., 394 U.S. at 501).

---

[5] The only case cited by Viega in support of its assertion that new market entry undermines market power—Barr Labs., Inc. v. Abbott Labs., Inc., 978 F.2d 98 (3d Cir. 1992)—is materially distinguishable. There, the court held at summary judgment that any ostensible power flowing from the defendant's approximate 50% market share was diluted by evidence of six new market entrants, six new products receiving regulatory approval, a relative lack of barriers to entry, and demonstrated market structure and price stability. See id. at 112-15.

NIBCO does not explicitly state the financial effect on interstate commerce in terms of dollars and cents. But NIBCO does allege that Viega's net sales in 2016 approximated $115,000,000 and that this figure represents 71% of the copper press fittings market. (Doc. 1 ¶¶ 35, 120). NIBCO maintains a 17% share of the copper press fittings market, translating to approximately $27,500,000 in sales. (See id. ¶¶ 35, 38). We are not prepared at this stage to find that attempting to foreclose this volume of competition is insubstantial. Viega's claim that its conduct "impacted, at most, seven wholesale distributors," misapprehends NIBCO's complaint. (See Doc. 24 at 19). The complaint is clear that the seven distributors identified therein are representative, nonexhaustive exemplars. (See Doc. 1 ¶ 76).

Viega rejoins that the *per se* tying claim must fail because the arrangement "constrain[s] only dealers" and thus there is "little danger to competition." (Doc. 24 at 18). Viega identifies a handful of cases which have held, at summary judgment or after trial, that when a manufacturer is able to circumvent a tying scheme and nonetheless reach the consumer, the arrangement is not *per se* unlawful. (See id. at 18-20). We find these cases to be procedurally and substantively distinguishable. The Fifth Circuit's decision in Roy B. Taylor Sales, Inc. v. Hollymatic Corp., 28 F.3d 1379 (5th Cir. 1994), issued on appeal after a full trial record had been developed by the district court. The case concerned product line restraints imposed on a dealer of hamburger patty machines and patty paper by its patty product supplier. Id. at 1380. On appeal, the court found that the dealer had not proven that the tying arrangement foreclosed consumer choice because consumers were free to look to other distributors and "purchase the two goods separately." Id. at 1382-84. In

Smith Machinery Co. v. Hesston Corp., 878 F.2d 1290 (10th Cir. 1989), a case involving "line forcing"[6] rather than a "traditional tying practices," the court focused on "foreclosure of choice to the ultimate consumer" and resolved at the summary judgment stage that "[n]o such foreclosure" had been demonstrated in that case. Id. at 1297.

As the Hollymatic and Smith Machinery courts observed, "foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal *per se*." Hollymatic, 28 F.3d at 1384 (quoting Smith Machinery, 878 F.2d at 1297). Based on the allegations of the complaint, it is plausible that the ultimate consumer (whether defined as the bidding contractor or the soliciting engineer or designer) is deprived of choice by Viega's endeavor to wield its market power in the carbon steel press fittings market to eradicate competition from the copper press fittings market. And NIBCO's complaint dispenses with Viega's anticipated response—that contractors can simply select a secondary and separate distributor for copper press fittings—by alleging that contractors as a matter of practice are unwilling to work with multiple distributors. (Doc. 1 ¶ 54).

Viega's argument asks the court to assume, notwithstanding NIBCO's contrary allegations, that NIBCO can sidestep distributors to access consumers. For example, Viega remonstrates that NIBCO's fittings can also be purchased at large retail chains such as Menards, Home Depot, and Lowe's. (Doc. 24 at 19 n.4). Much of Viega's argument in this respect rests on information sourced from beyond

---

[6] The court described "line forcing" as obligating dealers or distributors to carry a representative line of products. See id. at 1295 & n.5.

the complaint—whether from Viega's own institutional knowledge or from sources such as NIBCO's website—undergirding the court's view that a factual record must be developed to test Viega's claim of a substantial effect on interstate commerce.

We find that NIBCO has stated a plausible claim of *per se* tying between the copper press fitting and carbon steel press fitting markets. Because we conclude that Count I survives Rule 12(b)(6) scrutiny as to the *per se* tying claim, we do not address the alternative rule of reason theory at this juncture.

### 4.    *Count II: Contracts in Restraint of Trade*

In Count II, NIBCO alleges that Viega has participated in contracts in restraint of trade in violation of Section 1 of the Sherman Act. To prevail on this claim, a plaintiff must establish "(1) concerted action by the defendant[]; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005) (collecting cases); see also *In re* Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314-16 (3d Cir. 2010). Existence of an agreement is the *essentia* of this Section 1 claim. Gordon, 423 F.3d at 207 (citing Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 639 (3d Cir. 1996)).

Viega does not deny the existence of an agreement. (See Doc. 24 at 23). And Viega effectively concedes that Count I and Count II otherwise rise and fall together as the balance of the elements of the concerted-action claim align with NIBCO's *per se* tying claim. (See id.; Doc. 26 at 13 n.4). Accordingly, we will deny Viega's motion to dismiss Count II for the same reasons we have denied the motion as to Count I.

### 5. *Counts III and IV: Monopolization and Attempted Monopolization*

In Counts III and IV, NIBCO asserts claims for monopolization and attempted monopolization, respectively, of the copper press fittings market. We examine these claims *seriatim.*

A plaintiff must plead two elements to state a claim of monopolization: (1) that the defendant possesses monopoly power in the relevant product and geographic markets, and (2) that the defendant willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 75 (3d Cir. 2010) (quoting Eastman Kodak Co., 504 U.S. at 481). The second factor examines whether the alleged monopolist has acquired or maintained its power by competing "on some basis other than the merits." Id. (quoting LePage's Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003) (*en banc*)).

Viega asserts that NIBCO has failed to allege monopoly power or a dangerous probability of achieving monopoly power in the copper press fittings market. Monopoly power is "the ability 'to control prices or exclude competition.'" United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (quoting United States v. Grinnell Corp., 384 U.S. 563, 571 (1966)). As a general rule, "because such evidence is only rarely available," id. (quoting United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001)), a court may consider whether the defendant possesses "a predominant share of the market" and the "size of that portion" in considering

21

whether monopoly power exists, id. (citing Grinnell, 384 U.S. at 571; Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)).

In support of the argument that it lacks monopoly power, Viega cites to NIBCO's averment that (1) NIBCO "offer[s] one of the most robust lines of copper press fittings in the United States" and (2) a new competitor entered the carbon steel press fittings market in the last year. (Doc. 24 at 25). The former allegation regarding NIBCO's perception of the quality and breadth of its own product lines does nothing to undermine Viega's substantial share of the market. And we have already held *infra* that the existence of a single new market entrant—possessing less than 5% of the market share—cannot alone defeat NIBCO's allegations that Viega possesses considerable market power within the carbon steel press fittings market. A single new market entrant likewise does not alone weaken allegations of monopoly power established by the complaint. See McWane, Inc., 783 F.3d at 831-32 (citing Rebel Oil Co., 51 F.3d at 1440; Reazin, 899 F.2d at 971; Oahu Gas Serv., Inc., 838 F.2d at 366-67). Finally, to the extent Viega asserts that NIBCO does not meet the second element, we disagree: NIBCO avers (and offers ample facts to support) that Viega has wielded its monopoly power to foreclose consumer choice in the copper press fittings market based on factors other than merit.

To prevail on a claim of attempted monopolization, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Race Tires Am., Inc., 614 F.3d at 75 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)). We found *supra* that the complaint

adequately alleges that Viega restrained competition in the copper press fittings market by tying sales of its carbon steel press fittings to sales of its copper press fittings and depriving consumers of free choice and the benefit of price competition. The nature of Viega's alleged conduct permits the inference that it was undertaken with specific intent to monopolize and increase its power in the relevant markets. Accordingly, NIBCO's attempted monopolization claim also survives Rule 12(b)(6) scrutiny.

### 6.    *Antitrust Standing*

Viega also contends that NIBCO has not established antitrust standing. An antitrust plaintiff must show that it suffered a cognizable "antitrust injury" as a result of the misconduct alleged.  Id. at 75.  The antitrust laws were intended to protect "competition not competitors."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe Co., 370 U.S. at 320).  Thus, to proceed on federal antitrust claims, a plaintiff must establish both "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful."  Race Tires Am., Inc., 614 F.3d at 76 (quoting Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993)).

Viega asserts that NIBCO has failed to plead a relevant injury to competition flowing from the alleged tying arrangement, monopolization, or attempted monopolization.  We reject this assertion.  NIBCO has adequately pled that Viega's purported conduct deprives copper press fitting consumers of free choice.  NIBCO also alleges that the tie results in decreased price competition and,

consequently, higher prices to the consumer.  We conclude that NIBCO has sufficiently pled an antitrust injury for purposes of Rule 12(b)(6).

### B.    Tortious Interference with Contractual Relations

NIBCO also asserts a claim for tortious interference with contractual or business relations.  To state a tortious interference claim under Pennsylvania law, a plaintiff must establish (1) existing or prospective contractual economic relations between itself and a third party, (2) purposeful action by the defendant specifically intending to harm or prevent that relationship, (3) without privilege or justification, and (4) resulting in legal damage to the plaintiff.  See Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 212 (3d Cir. 2009) (citing Brokerage Concepts, Inc., 140 F.3d at 530).  NIBCO premises this claim on Viega's alleged interference with existing economic and business relationships between NIBCO and certain wholesale distributors.

Viega's response to NIBCO's tortious interference claim is twofold: *first*, Viega contends that NIBCO has failed to plead existing contractual or business relationships or more than a "mere hope" of future relationships; and *second*, it asserts that NIBCO has failed to articulate an independently actionable wrong by Viega, suggesting that Viega is privileged to interfere, to a certain degree, in existing relationships in the name of competition.  (See Doc. 24 at 31-32).

Viega's first argument is refuted by the complaint.  NIBCO explicitly describes existing business relationships between itself and seven distributors— Weinstein; Moore Supply; Mid-City Supply; American Pipe; Sheehy, Inc.; Peabody;

and Western Nevada—and a reasonable expectation of continued relationships. (Doc. 1 ¶¶ 77-102). And it describes exactly how Viega went about forcing those distributors to terminate their business relationships with NIBCO by threatening to withhold its own carbon steel press fittings. (Id.) As for Viega's second argument, we have concluded herein that NIBCO sufficiently pleads independently actionable wrongdoing by articulating plausible violations of the antitrust laws. See, e.g., UniStrip Techs., LLC v. LifeScan, Inc., 153 F. Supp. 3d 728, 743-44 (E.D. Pa. 2015); cf. Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2014 WL 2616824, *24 & n.19 (E.D. Pa. June 11, 2014) (dismissing tortious interference claim after underlying antitrust claim was dismissed). The court will deny Viega's motion to dismiss NIBCO's tortious interference claim.

## IV. Conclusion

We find that NIBCO has articulated plausible violations of the Sherman Act and Clayton Act as well as Pennsylvania common law. Accordingly, the court will deny Viega's motion (Doc. 23) to dismiss NIBCO's complaint. An appropriate order shall issue.

 /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     November 5, 2018